Case 1:19-cv-00016 Document 64 Filed on 08/18/20 in TXSD Page 1 of 17

United States District Court
Southern District of Texas
**ENTERED**
August 18, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| A-PRO TOWING AND RECOVERY, LLC, *et al.*, § <br> § <br> Plaintiffs, § <br> VS. § <br> § <br> CITY OF PORT ISABEL, *et al.*, § <br> § <br> Defendants. § <br> § | CIVIL ACTION NO. 1:19-CV-00016 |

## MEMORANDUM OPINION

A-Pro Towing and Recovery, LLC is a tow company that operates in Port Isabel, Texas. A-Pro filed this action against Port Isabel City Commissioner Martin Cantu, Sr., alleging that Cantu used his official position to run A-Pro out of business, to the benefit of tow companies that Cantu and his relatives operate in the area. Cantu's conduct allegedly violated A-Pro's Fourteenth Amendment right to operate a tow company and to equal protection under the law. In addition, A-Pro alleges that Cantu's conduct amounted to an attempt to monopolize the market, in violation of the Sherman Antitrust Act.

Cantu moved for summary judgment as to all claims. On August 3, the Court granted the Motion and dismissed all of A-Pro's causes of action. (Order, Doc. 63) In this Memorandum Opinion, the Court provides the reasons supporting that decision.

### I. Factual Background

### A. Summary Judgment Facts[1]

In 2016, Joanna Peña formed A-Pro as a tow company and obtained a state license to operate in the City of Port Isabel. (*See* License Application, Doc. 44-18; J. Peña Dep., Doc. 40-1, 27:5–27:11) Her husband, Eduardo Peña, manages the business.[2]

In Spring 2016, A-Pro applied for assignment to the Port Isabel Police Department

---

[1] The Court views the competent summary judgment evidence in the light most favorable to A-Pro. *See* FED. R. CIV. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[2] E. Peña initially joined this lawsuit alongside A-Pro, alleging the same causes of action as the company. The Court dismissed his claims for lack of standing. (Am. Order, Doc. 22; Order Denying Mot. to Am. Compl., Doc. 32)

wrecker rotation list (Rotation List). (*See* License Application, Doc. 44-18) The PIPD assigns an approved wrecker company a 24-hour shift to provide nonconsensual towing services. (Lopez Dep., Doc. 44-2, 13:15–14:1, 18:19–19:13) When a PIPD dispatch officer receives a call that requires the nonconsensual tow of a vehicle—such as for being illegally parked—and the owner expresses no preference or is unable to express a preference regarding the tow company, the officer calls the company assigned to that day to provide the service. (*Id.* at 18:7–19:13) On its assigned day, a tow company receives all of PIPD's requests for nonconsensual tows, and the subsequent payment from the vehicle owner. (*Id.* at 14:21–14:25; Cantu Dep., Doc. 44-1, 35:12–35:14) If the assigned tow company is unavailable or does not answer the dispatcher's call, the dispatcher calls the next company on the list, following the same rotation pattern in the monthly calendar. (Lopez Dep., Doc. 44-2, 13:18–13:21) The PIPD supervisor dispatcher creates the Rotation List each month. (*Id.* at 15:20–15:23) PIPD does not maintain written policies or procedures regarding its application criteria or enforcement of the Rotation List. (*Id.* at 15:11–15:14, 17:12–17:17)

On June 8, 2016, PIPD Chief Gualberto Gonzalez denied A-Pro's request to be added to the Rotation List, ostensibly based on A-Pro's name:

> I find most of your paper work to be in order however I find a problem in the name you are using for your wrecker company. After talking to my dispatchers and several of my officers, it is my opinion that to avoid any confusion or misunderstanding between the A-Pro wrecker already on rotation and you're [sic] A-Pro Wrecker we cannot have two wrecker services in our rotation with the same name. You are licensed by the State to operate in the City of Port Isabel however because of the reasons noted I am denying you on the Police Department Rotation, unless you reapply and use a different name.

(Denial Ltr., Doc. 44-19, 1) The similarly-named tow company that Gonzalez referred to was "A-Pro Island Beach Towing", owned by Cantu's mother, Maria Del Pilar Cantu. (Cantu Dep., Doc. 44-1,23:13–23:19)

A-Pro contested the denial, but eventually decided to conduct business as "Isla Towing". (*See* A-Pro Letter to Gonzalez, Doc. 44-20) With the name change, Chief Gonzalez approved

2 / 17

A-Pro for the Rotation List. (J. Pena Dep., Doc. 40-1, 27:7–27:11) Later, A-Pro also began doing business as "Paradise Towing" and secured a second assigned day on the Rotation List. (*Id.* at 29:15–29:19)

Cantu is a Port Isabel City Commissioner. He and members of his family own several towing companies. Cantu directly owns City Towing and M. Cantu Towing, and is co-owner of Cantu Brothers and Sons, LLC, which does business as "Cantu's Auto Repair, Body Shop, and Wrecker Service" and "Cantu's Wrecker and City Garage". (Cantu Dep., Doc. 44-1, 9:6–9:13, 49:1–49:4, 121:22–123:5) Each of these tow companies, including each of the d/b/a's, holds a spot on the Rotation List. Cantu's mother owns "A-Pro Island Beach Towing", which employs Cantu as manager. (*Id.* at 49:5–49:7, 54:24–55:9) And Cantu's son, Martin Cantu, Jr., owns "Bay City Towing". (*Id.* at 49:10–49:14) A-Pro Island Beach Towing and Bay City Towing each hold one assigned spot on the Rotation List. (*Id.* at 158:1–158:7)

A-Pro premises its claims on the alleged misuse by Cantu of his position as Commissioner to control the Rotation List to his benefit and to A-Pro's financial detriment. Two former PIPD officers, David Martinez and Lealani Cooper, declare that even though PIPD instructs officers how to use the Rotation List, the officers do not always follow those instructions. (*See* Martinez Aff., Doc. 44-5; Cooper Aff., Doc. 44-6) For example, when officers encounter a vehicle that requires towing services, officers should first "call dispatch who [will] then call the tow company", and they may not "call the tow company directly for a tow." (Martinez Aff., Doc. 44-5, ¶¶ 12, 13) Despite these instructions, Martinez witnessed PIPD officers contacting tow companies "directly from their cell phones for vehicle tows." (*Id.* at ¶ 14) Officer Cooper also observed an "obvious preference" within PIPD regarding the tow companies on the Rotation List. (Cooper Aff., Doc. 44-6, 1) Officer Cooper knew that Cantu owned "[s]everal tow companies on the list", and believed "[t]here was an obvious bias against [A-Pro] because the commission[er] was also a wrecker company owner." (*Id.*) According to Cooper, this bias "continued to be obvious until [A-Pro] no longer existed." (*Id.*)

Joe Garza, Jr., a PIPD Communications Supervisor from 2016-2017, also observed irregular conduct and recalls multiple interactions with Cantu regarding the Rotation List. Garza served as head of police dispatching, overseeing three police dispatchers who "field[ed] calls to the police", including calls between the officers and other city officials. (Garza Aff., Doc. 44-4, ¶ 5) For a period, Garza personally created the Rotation List, which Chief Lopez had to approve. (*Id.* at ¶ 6) Once Chief Lopez approved the list, Garza would notify each tow company of its assigned days on the Rotation List. (*Id.* ¶ 7)

Garza observed that Cantu "called [police dispatching] more [frequently] than any other City Commissioner." (*Id.* at ¶ 8) On three separate occasions, Cantu—identifying himself as a City Commissioner—called dispatch "to instruct" Garza and his staff "to call any of his four tow companies . . . if there were any police requests for a tow, even though it was [A-Pro's] designated day of the List's rotation". (*Id.* at ¶ 10) On the first two occasions, Cantu initially asked which tow company was designated for that day, and Garza responded that it was A-Pro. (*Id.* at ¶¶ 10-a, 10-b) During the first call, Cantu then instructed Garza "to use one of his tow companies instead of [A-Pro] for that day." (*Id.* at ¶ 10-a) When Garza questioned the instruction, Cantu responded that A-Pro "had an outstanding bond and that its insurance had expired." (*Id.*) During the second call, when questioned by Garza, Cantu stated that "he thought [A-Pro] was 'out of commission'" and again instructed Garza to use the next company on the list, "which Cantu knew to be one of [Cantu's] towing companies". (*Id.* at ¶ 10-b) After the second call, Garza informed Chief Lopez about Cantu's directives. (*Id.* at ¶¶ 10-a, 10-b) On the third occasion, Cantu called and "already knew whose tow rotation day it was". (*Id.* at ¶ 10-c) Cantu instructed Garza to "move to the next one which was one of Cantu's companies." (*Id.* at ¶ 10-c) With respect to this call, Garza neither questioned Cantu nor informed Chief Lopez. (*Id.*)

Garza also recalls other occasions when Cantu instructed him "to use [Cantu's] business when the police officers [called] in for a tow". (*Id.* at ¶ 11) And "[o]n several occasions", Cantu instructed Garza to skip a tow company that belonged to a competing operator named Chad

Hart. (*Id.* at ¶ 14) Garza informed Chief Lopez of his concern that "Cantu was improperly using the List and creating a monopoly." (*Id.* at ¶ 13) In addition, "on several occasions", Chief Lopez obtained the Rotation List from Garza and "change[d] it himself to exclude [A-Pro] from two to three weeks of that particular month." (*Id.* at ¶ 16)

On several occasions during 2018, PIPD failed to timely notify A-Pro of its assigned dates on the Rotation List. (E-mails to Lopez, Doc. 44-17) And Chief Lopez admitted that PIPD records reflect that, on some of A-Pro's assigned Rotation List days, a PIPD dispatcher had instead requested nonconsensual tow services from a tow company owned by Cantu or his family. (Lopez Dep., Doc. 44-1, 42:13–43:18)

A-Pro utilizes the PIDP Wrecker Logs to calculate the percentage of nonconsensual tow requests dispatched to three companies that Cantu owns, including the company he co-owns with his brother. In these calculations, A-Pro also attributes to Cantu the requests sent to the two other tow companies belonging to Cantu's mother and Cantu's son. Based on the wrecker log numbers, A-Pro argues that Cantu's total percentage for nonconsensual tows equaled 67.01% in 2016, 67.31% in 2017, and 66.11% in 2018.[3] (Response, Doc. 44, ¶ 45; PIPD Wrecker Logs, Doc. 44-11) During these periods, Cantu and his family owned four to five tow companies with slots on the Rotation List, and the list itself had 8 or 9 approved companies over the three years.

In 2017 and 2018, A-Pro experienced various challenges in its operations. The Texas Department of Licensing and Regulation (TDLR) charged A-Pro with a number of infractions related to disputed tow services, over-charged customers, and impermissible charges. (*See, e.g.,* Nov. 2017 TDLR Warning, Doc. 40-12; April 2018 TDLR Notice, Doc. 40-10 (referencing alleged misconduct, such as overcharging customers)) And in January 2018, A-Pro forfeited its corporate charter and remained in that status for at least six months. (TDLR Agreed Order, Doc. 40-8, 1, 5)

---

[3] A-Pro also asks the Court to attribute to Cantu the requests dispatched to a third-party company, on the grounds that the company was a "friendly competitor". (Response, Doc. 44, ¶ 72) A-Pro offers no rationale or legal authority for this request, which the Court declines.

In January 2020, Joanna Peña sold A-Pro's assets, including all of its equipment and contracts, to a third party. (J. Peña Dep., Doc. 40-1, 21:21–25:5)

### B. Objections to Summary Judgment Evidence

Both A-Pro and Cantu object to portions of the other side's proffered summary judgment evidence.[4]

#### 1. Cantu's Objections

Cantu objects to various statements in the affidavits of David Martinez, Lealani Cooper, and Joe Garza, Jr., on the grounds that the statements are inadmissible hearsay. (Reply, Doc. 54, ¶¶ 2.05–2.13) Although parties can rely on affidavits in connection with a motion for summary judgment, those affidavits cannot themselves contain hearsay statements. *See Martin v. John W. Stone Oil Distributor, Inc.*, 819 F.2d 547,549 (5th Cir. 1987) ("Neither the district court nor [appellate] court may properly consider hearsay evidence in affidavits and depositions.") (citing FED. R. CIV. P. 56(e)); *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."). A-Pro runs afoul of this rule on numerous occasions: the affidavits of Garza, Martinez, and Cooper are strewn with purported statements by other individuals who are not parties to this action and for which no exception to the hearsay rule applies. (*See, e.g.*, Garza Aff., Doc. 44-4, ¶¶ 10(a)-(c), 12 (including multiple statements by Officer Lopez to Garza); Martinez Aff., Doc. 44-5, ¶¶ 15, 20 (referencing statements by Sergeant Cadengo); Cooper Aff., Doc. 44-6, 1 (mentioning several statements by Officer Lopez)) The Court sustains Cantu's objections to these hearsay statements and does not consider them for purposes of the Motion.

#### 2. A-Pro's Objections

A-Pro argues that Cantu's "multiple references to [E. Peña's] criminal history and [] recent criminal indictment" is inadmissible character evidence. (A-Pro's Objs., Doc. 45, ¶¶ 1, 4)

---

[4] At the hearing on the Motion, the Court sustained Cantu's objections to the Affidavit of Daniel Garza in its entirety.

Cantu responds that he offers the evidence to "impeach" E. Peña and challenge his credibility. (Def. Response to Pl.'s Obj., Doc. 52)  For purposes of resolving the Motion, however, the Court resolves all competent summary judgment evidence in A-Pro's favor.  The Court cannot consider evidence offered to impeach or to challenge a witness's credibility, as such determinations would be for the fact finder at trial.  As a result, the Court sustains A-Pro's objections and does not consider, for purposes of the Motion, any evidence concerning E. Peña's criminal history or recent indictment.  The Court notes, however, that even absent A-Pro's objections, the Court would have concluded that this evidence does not bear on any issue that the Motion raises.

## II. Analysis

A-Pro brings three claims under 42 U.S.C. § 1983.  A-Pro alleges that Cantu violated its procedural and substantive due process rights under the Fourteenth Amendment by "using his office as a City Commissioner to harass and intimidate [A-Pro] in an effort to put Plaintiff out of business". (Compl., Doc. 1, ¶ 10)  In addition, A-Pro advances a "class of one" claim under the Equal Protection Clause of the Fourteenth Amendment, alleging that Cantu directed PIPD officers to treat "A-Pro differently than the other tow companies for no rational reason." (Compl., Doc. 1, ¶ 53)  Additionally, A-Pro brings a cause of action under the Sherman Antitrust Act, 15 U.S.C. § 2, alleging that Cantu "owns or effectively controls five towing companies" and attempted to create a "monopoly of the towing business in Port Isabel". (*Id.* at ¶¶ 11, 55)

Cantu seeks summary judgment as to each cause of action.[5]

### A. Standard of Review

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine dispute of material fact exists, and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  A genuine dispute over material facts exists if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it]

---

[5] Initially, A-Pro also sued the City of Port Isabel.  The Court previously dismissed all causes of action against the City. (Am. Order, Doc. 22)

may reasonably be resolved in favor of either party," and the fact at issue might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.* 47 U.S. 242, 248, 250 (1986). The moving party "bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). All facts and inferences drawn from those facts must be viewed in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

If this evidence is provided, the burden then shifts to the responding party to present affirmative evidence to defeat the motion. *Anderson,* 477 U.S. at 257. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). "Unsubstantiated assertions, improbable inferences, and unsupported speculation, however, are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) (internal quotation marks omitted).

### B. Due Process Claims

Cantu argues that A-Pro presents no competent summary judgment evidence showing that Cantu violated A-Pro's protected liberty interest. (Motion, Doc. 40, ¶¶ 1.03, 1.04) Additionally, he maintains that even if A-Pro could establish a Fourteenth Amendment violation, Cantu is insulated from liability under the doctrine of qualified immunity. (*Id*. at ¶ 1.05) The parties agree that the protected liberty interest at issue is A-Pro's right to practice its chosen profession free from unreasonable governmental interference.[6] (Motion, Doc. 40, ¶ 5.02; Response, Doc. 44, ¶ 135)

Under Section 1983, a plaintiff may successfully demonstrate a Fourteenth Amendment violation by demonstrating that a defendant, "acting under color of state law, sought to remove

---

[6] Cantu does not challenge whether the alleged due process rights extend to business entities such as A-Pro. The Court assumes without deciding that they do.

8 / 17

or significantly alter [the plaintiff's] liberty and property interests" without due process of law. *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 704 (5th Cir. 1991). The Supreme Court has recognized that the Fourteenth Amendment protects against arbitrary and wrongful state action that infringes upon "some generalized due process right to choose one's field of private employment". *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999); *see also Greene v. McElroy*, 360 U.S. 474, 492 (1959) ("[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment."). The Fifth Circuit has "also repeatedly acknowledged the principle that a person has a liberty interest in pursuing an occupation". *Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983), on reh'g in part, 724 F.2d 490 (5th Cir. 1984) (finding that an industry custom that created a de facto licensing program amounted to governmental interference that prevented the plaintiff from private employment in the savings and loan industry).

Government actions, however, "that cause 'a brief interruption' of a person's occupational calling do not amount to a deprivation of this liberty interest in the same way as 'a complete prohibition of the right to engage in a calling.'" *Doss v. Morris*, 642 F. App'x 443, 447 (5th Cir. 2016) (quoting *Conn v. Gabbert*, 526 U.S. 286, 292 (1999)). In *Conn*, for example, the Supreme court concluded that no due process violation occurred when a county prosecutor detained a defense attorney on the strength of a search warrant and, in doing so, prevented the attorney from advising a client who was testifying before a grand jury. The detention represented a "brief interruption" of the attorney's ability to practice law, and not a complete prohibition. In addition, courts have concluded that no due process violation occurs when the alleged wrongful conduct only curtails a limited aspect of an individual's ability to pursue her chosen livelihood, while leaving other avenues open. *See, e.g.*, *Ferrell v. Dallas Indep. Sch. Dist.*, 392 F.2d 697, 704 (5th Cir. 1968) (concluding that a school's regulation requiring students to cut or trim their hair did not "interfere with [their] right to continue in their chosen

occupation of professional rock and roll musicians"); *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972) (concluding that the plaintiff did not present a due process claim because "[t]he State . . . did not invoke any regulations to bar the respondent from all other public employment in state universities")).

In the context of the tow business, the Fifth Circuit has recognized a due process claim when the plaintiff alleged that a state actor's conduct interfered with the owner's private business, but not when the alleged interference affected only the owner's right to government referrals. *Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995) (affirming dismissal because the plaintiff did "not allege that the revocation of his police radio privileges and his ineligibility for continued [Harris County Wreckers] Association membership prevent[ed] him from engaging in nongovernment-generated business"); *Cowan v. Corley*, 814 F.2d 223, 228 (5th Cir. 1987) (recognizing a viable claim because the plaintiff alleged interference with his right to conduct business with private individuals). When the alleged wrongful conduct affects only the plaintiff's government-referred business, the plaintiff must demonstrate an "entitlement to be or remain on [a city's] on-call rotation list", and that "his interest in remaining on the rotation list is more than a unilateral expectation". *Blackburn*, 42 F.3d at 937, 940. Such an entitlement can "stem[] from a state statute or regulatory scheme, a contract, or any other independent source". *Id.*

In the present case, A-Pro contends that Cantu took affirmative actions to violate its protected liberty interest of operating as a tow company and eventually deprived A-Pro of its existence.[7] (Response Doc. 44, ¶ 136; *see also id.* at ¶ 142 ("Cantu used his influence as a prominent Commissioner to utilize various wings of the municipality to harass A-Pro . . . so much that A-Pro was forced to sell its assets.") But A-Pro fails to create a genuine issue of material fact sufficient to survive summary judgment. No competent summary judgment

---

[7] In its Response, A-Pro includes additional arguments based on allegations not included in its Complaint and regarding conduct by individuals other than Cantu. (*See* Doc. 44, ¶¶ 143, 145–147, 149–150, 152) The Court declines to consider these arguments.

evidence demonstrates that Cantu directly or indirectly sought to remove or significantly alter A-Pro's ability to operate as a tow company. At most, A-Pro demonstrates that on a few occasions, Cantu diverted calls away from A-Pro and to one of his wrecker companies. These occasions, however, represent only a brief interruption with A-Pro's right to engage in its chosen profession. And the evidence on which A-Pro relies for these occasions demonstrates that when asked to explain the diversion, Cantu proffered a reasonable explanation. A-Pro offers no evidence suggesting that Cantu's explanations were pretextual, false, or otherwise unreasonable.

In addition, A-Pro offers no evidence that Cantu directly or indirectly interfered with A-Pro's business in the private sector or in areas outside of Port Isabel. On the contrary, A-Pro acknowledges that even though Joanna Peña sold A-Pro's assets, the business "remains . . . in good standing", and holds about 200 private tow contracts.[8] (Response, Doc. 44, 6 n.2; *id.* at ¶ 74; A-Pro Private Agreements, Doc. 40-14) The summary judgment record contains no evidence showing that Cantu adversely impacted A-Pro's private business. And A-Pro offers no evidence or argument showing a statutory or contract-based entitlement to remain on the Rotation List.

A-Pro relies on the Fifth Circuit's decision in *Kacal*, in which the court concluded that fact issues existed regarding whether a police department's conduct caused the plaintiff to close her arcade. (Response, ¶¶ 141–42 (citing *Kacal*, 928 F.2d 697, 704 (5th Cir. 1991)). But in that case, evidence existed of lost income and a decline in customers. In contrast, A-Pro offers no analogous evidence regarding A-Pro's business. As a result, *Kacal* does not help A-Pro here.

As A-Pro has not demonstrated that a genuine issue of material fact exists regarding its due process claims, these causes of action cannot survive summary judgment.

### C. Equal Protection

A-Pro pursues an equal protection "class of one" claim against Cantu, alleging that

---

[8] The evidence is controverted as to whether J. Peña retains an interest in A-Pro. But as she is not the plaintiff, whether she does or not is immaterial to whether Cantu's alleged conduct adversely affected A-Pro. In addition, A-Pro also points to evidence concerning Cantu's alleged treatment of E. Peña, including that Cantu had "[E.] Pena wrongfully accused of a crime he did not commit." (Response, Doc. 44, ¶ 145) But even if true, A-Pro does not explain how such conduct interfered with A-Pro's ability to do business.

"Cantu used his influence as a City Commissioner to influence PIPD and the city attorney into treating A-Pro and Cantu's entities with a clear and apparent bias in favor of Cantu's entities." (Response, Doc. 44, ¶ 110; *see also* Compl., Doc. 1, ¶ 53 (alleging that A-Pro has "been treated differently than similarly situated tow companies owned by Defendant Cantu for a discriminatory purpose"))

To bring such a claim, a plaintiff must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383, 387 (5th Cir. 2008) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). "[T]o ultimately prevail on the claim, the [plaintiff] must carry the heavy burden of negativing any reasonably conceivable state of facts that could provide a rational basis for their differential treatment.'" *Id.* (quoting *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 349 (5th Cir. 2006)) (internal quotation marks omitted). "[T]he burden is on the challenging party" to demonstrate that there is no rational basis upon which the city could have based its treatment. *Integrity Collision Ctr. v. City of Fulshear*, 837 F.3d 581, 589 (5th Cir. 2016).

A-Pro's claim fails because it brings forth no evidence showing that Cantu's conduct occasioned any disparate treatment. At most, A-Pro offers the declaration of Garza, who states that on a few occasions, Cantu instructed dispatch officers to skip A-Pro on the Rotation List because A-Pro had an "outstanding bond", an "expired license", or an "out of commission" status. (*See* Garza Aff., Doc. 44-4, ¶¶ 10(a–b))  Because A-Pro has produced no evidence to negate the explanations that Cantu offered when diverting business away from A-Pro, the company fails to create a fact issue regarding the absence of a "rational basis for the difference in treatment". *See Integrity Collision*, 837 F.3d at 589 (dismissing plaintiffs' class of one claims based on their exclusion from a city's non-consent tow list because they "failed to demonstrate that there [was] no rational basis upon which the city could have excluded them from the non-consent tow list").

12 / 17

A-Pro also points to instances in which various city officials treated A-Pro more strictly than the companies that Cantu and his family owned. (Response, Doc. 44, ¶¶ 112-14 (contending that City Attorney Hinojosa "was strict with A-Pro on the name [it] could use on the PIPD tow list", while allowing Martin Cantu, Jr. to operate a business called "Bay City Towing", despite a competitor named "Bay Area Towing"); *id.* at ¶ 115 (offering evidence that PIPD informed Cantu of his scheduled days on the list, but "ignored" A-Pro's requests for the schedule); *id.* at ¶¶ 116–18 ("PIPD denied A-Pro rotation days while granting Cantu extra days"); *id.* at ¶ 119 ("PIPD never called A-Pro in lieu of Cantu's wrecker business")) But as A-Pro offers no evidence indicating that any of these individuals acted under Cantu's direction or control when engaged in this behavior, this evidence is not evidence of Cantu's alleged wrongful conduct.[9]

For these reasons, A-Pro's equal protection claim fails to survive summary judgment.[10] And as A-Pro has not demonstrated that a genuine issue of material fact exists as to any of its Fourteenth Amendment claims, the Court declines to consider Cantu's defense of qualified immunity.

### D. Sherman Antitrust Act Claim

A-Pro alleges that Cantu "attempted to monopolize the towing business in Port Isabel by engaging in predatory or exclusionary conduct with the specific intent to monopolize". (Compl. Doc. 1, ¶ 56 (citing Sherman Antitrust Act, 15 U.S.C. § 2))

Section 2 of the Sherman Antitrust Act prohibits the abuse of monopoly power as well as the "attempt to monopolize . . . any part of the trade or commerce among the several States." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016) (quoting 15 U.S.C. § 2) (internal quotation marks omitted). "[A] plaintiff must show: '(1) that the

---

[9] A-Pro offers additional examples of disparate treatment, but offers no competent summary judgment evidence in support. (*See* Response, Doc. 44, ¶¶ 120–22) As a result, the Court declines to consider these examples.

[10] In addition, Fifth Circuit jurisprudence addressing class-of-one claims in analogous circumstances appears to raise additional barriers to claims based on the removal of a tow company from a rotation list. *See Rountree v. Dyson*, 892 F.3d 681, 684 (5th Cir.), cert. denied, 139 S. Ct. 595 (2018); *Integrity Collision Ctr.*, 837 F.3d at 589. But as Cantu has not moved for summary judgment based on the analysis of these cases, the Court will not reach this issue.

defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  In addition, "some nexus between the defendants' conduct and interstate commerce" must exist.  *Gulf Coast Hotel-Motel Ass'n v. Mississippi Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 504 (5th Cir. 2011); *see also Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 739, 744 (1976).

### 1. Jurisdiction

A court can *sua sponte* consider whether it has subject matter jurisdiction.  *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 575 (5th Cir. 2003); *Gray ex rel. Rudd v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400, 411 n.10 (5th Cir. 2004).  Whether the required nexus between the alleged conduct and interstate commerce exists determines whether the court has jurisdiction over the claim.  *See, e.g.*, *Cowan v. Corley*, 814 F.2d 223, 225 (5th Cir. 1987) (concluding that jurisdiction existed because the providing of tow services on two major federal highways bore a sufficient relationship to interstate commerce); *Mississippi Gulf Coast Ass'n*, 658 F.3d at 504 (finding that jurisdiction existed because "bringing out-of-state tourists to hotels to play golf . . . falls squarely within the Supreme Court's Commerce Clause jurisprudence").  The plaintiff bears the burden to demonstrate that the court has subject matter jurisdiction to hear an antitrust claim.  *See Ancar v. Sara Plasma, Inc.*, 964 F.2d 465, 469 (5th Cir. 1992) ("As an antitrust claimant, [Plaintiff] has the burden of establishing that the alleged proscribed practices affect interstate commerce."); *Cowan*, 814 F.2d at 225.

"[J]urisdiction may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce."  *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980).  Instead, a plaintiff must allege a "critical relationship" between interstate commerce and the conduct at issue".  *Id.*  "[I]f these allegations are controverted [the plaintiff] must proceed to

demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." *Id.*

Here, the Court concludes that A-Pro has failed to demonstrate the required nexus between Cantu's alleged wrongful conduct and interstate commerce.[11]  A-Pro offers no jurisdictional evidence to support its allegation that Cantu's alleged conduct or A-Pro's business itself affects interstate commerce.  Instead, A-Pro asks the Court to take judicial notice of studies that indicate that "South Padre Island is a popular spring break and vacation destination", and of a map showing that one state highway connects South Padre Island to Port Isabel and the rest of Texas. (Response, Doc. 44, ¶¶ 86–87)  The Court accepts that travelers, both from Texas and other states, drive through Port Isabel to reach South Padre Island.  But this fact does not establish that Cantu's alleged wrongful conduct or A-Pro's business has any impact on interstate commerce, much less the "critical relationship" required to establish jurisdiction over a Sherman Antitrust Act claim.

A-Pro relies on *United States v. International Boxing Club*, but that case is markedly distinguishable. (Response, Doc. 44, ¶ 85 (citing *Int'l Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242, 252 (1959))  In that case, the Supreme Court concluded that jurisdiction existed because, in part, the defendant promoted its business outside of the state.  *Int'l Boxing Club*, 358 U.S. at 252.  In fact, the jurisdictional evidence demonstrated that out-of-state revenue accounted for 25% of total revenue.  *Id.* at 248.  In contrast, A-Pro neither provides any evidence demonstrating that any tow company in Port Isabel promotes its business to out-of-state travelers, nor any evidence indicating the revenue that such travelers provide to tow companies in Port Isabel.  As a result, A-Pro fails to establish that jurisdiction exists over its claim under the Sherman Antitrust Act.

---

[11] In his Motion, Cantu contends that A-Pro has not established the required nexus, but he does not couch the argument as one challenging jurisdiction.  (Motion, Doc. 40, ¶ 5.32)

### 2. Monopoly Power[12]

In his Motion, Cantu argues that no evidence demonstrates that he acquired monopoly power in Port Isabel or engaged in predatory or exclusionary conduct. (Motion, Doc. 40, ¶¶ 5.29, 5.31)

Under Section 2, "the crime of monopolizing" occurs when a party "acquire[s] or maintain[s] the power to exclude competitors from any part of the trade or commerce among the several states", and has the ability, and "intent and purpose to exercise that power". *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). "[T]he essential attributes of illegal monopoly power are judged by the monopolist's participation in the relevant market." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 335 (5th Cir. 2015). A finding of monopoly power may be gleaned from a party's "ability to extract above-market profits from raised prices", "possession of large market share", or "ability to exclude one's competitors" in the relevant market. *Id.* For an attempt to monopolize claim, to determine whether there is a dangerous probability of monopolization, courts consider the relevant market and the defendant's ability to lessen or destroy competition in that market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

A plaintiff, of course, must do more than simply demonstrate that an actual monopoly or a dangerous probability of one exists. "[S]imply having or acquiring a monopoly is not in and of itself illegal. Rather, the illegal abuse of power occurs when the monopolist exercises its power to control prices or exclude competitors from the relevant market for its products." *Gurrola v. Walgreen Co.*, 791 F. App'x 503, 505 (5th Cir. 2020) (quoting *Am. Quarter Horse Ass'n*, 776 F.3d at 334) (internal quotations and alterations omitted). Exclusionary conduct includes "the creation or maintenance of monopoly by means other than the competition on the merits". *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). "The key factor courts have analyzed in order to determine whether challenged conduct is or is not competition

---

[12] The Court addresses the merits of the cause of action in the alternative to facilitate appellate review.

on the merits is the proffered business justification for the act." *Id.* "If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Id.*

In the present case, A-Pro brings forward no evidence showing that Cantu has established a monopoly or presents the dangerous probability of doing so in the relevant market. As an initial matter, A-Pro does not even address Cantu's power in the market at issue—*i.e.,* the tow company industry in Port Isabel. Rather, to the extent that A-Pro offers evidence, it focuses solely on Cantu's ability to influence the Rotation List. But the Rotation List represents only a portion of the relevant market, and the summary judgment record does not reveal the size of that portion. As a result, no evidence suggests that the Rotation List represents a significant portion of the overall tow business market in Port Isabel. With respect to the Rotation List, A-Pro relies on evidence demonstrating that the companies that Cantu owned received between 40 and 65% of the nonconsensual tow business during different time periods. A-Pro requests that Cantu also be attributed the business given to tow companies that his family members owned. But doing so only shows that Cantu and his family controlled "a majority" of the days on the Rotation List, and received about 65% of the nonconsensual tow business. Given that the Rotation List represents only a portion of the overall relevant market, the fact that Cantu's tow companies received about 65% of that sub-market does not create a fact issue on the element of monopoly power in the overall market.

### III.    Conclusion

For these reasons, and as reflected in the Court's prior Order (Doc. 63), A-Pro's causes of action against Martin Cantu, Sr. do not survive summary judgment.

SIGNED this 18th day of August, 2020.

_Fernando Rodriguez, Jr._
Fernando Rodriguez, Jr.
United States District Judge